James MOORE, Libelant,

v.

THE S. S. AMERICAN, her engines, apparel, etc., Respondent,
Seaboard Machinery Corp., Respondent-Impleaded,
The Jarka Corporation, Respondent-Impleaded.

No. 19806.

United States District Court
E. D. New York.

Nov. 30, 1956.

Phillips & Kalb, New York City, by Barnet S. Blume, New York City, of counsel, for libelant.

Tompkins, Boal & McQuade, New York City, by Gray Williams, New York City, of counsel, for respondent.

Garvey & Conway, New York City, by George J. Conway, New York City, of counsel, for Jarka Corp.

BYERS, District Judge.

This libelant seeks recovery for personal injuries suffered by him on October 20, 1950 when he was working as a member of a longshore gang on the respondent's (American-Hawaiian Steamship Company's) ship, the S. S. Mt. Whitney, now known as the S. S. American, while she was lying at Port Newark, New Jersey.

The impleaded respondents are Seaboard Machinery Corp. and The Jarka Corporation, the latter being the stevedore in whose employ the libelant was serving at the time.

At the trial the impleading petition against the Seaboard was withdrawn on the part of the respondent. The cause therefore proceeded against the American-Hawaiian on the theory of negligence, and against the Jarka on the theory of its possible responsibility to indemnify the shipowner, by reason of its own negligence if such should be shown.

The fact of the libelant's injury and the way it happened are not in dispute.

The ship was known as a C–4 and the precise issue of liability has to do with the nature of the hatch beams with which ships of that class were equipped.

There were four decks, called in the testimony, A, B, C and D, the latter being the lower 'tweendeck, at hatch No. 2, the place where libelant was working; the hatch opening measured 28 feet fore and aft and 20 feet athwartships; there were three tiers of hatchboards laid upon hatch beams 9 feet long and about 1½ feet wide, and they were disposed fore and aft, resting on top of the beams.

The forward tier had been removed prior to the accident, which means that there was an open space about 20 feet wide and about 9 feet long through which cargo from the lower hold was being hoisted on 3½-foot pallets capable of carrying about three tons of cargo.

The vertical height of the lower hold was about 11½ feet; the pallets were being raised by a winch operated from a platform about 10 feet high on A Deck, and it is agreed that the winchman standing on that platform and looking down into this hold, would be about 37½ feet above the level of the hatchboards which remained in place.

There is no testimony concerning either the presence or absence of artificial illumination at or above that level, which would aid the vision of the winchman as he looked down.

The libelant had been working in hatch No. 4 but was instructed to go to lower 'tweendeck No. 2, at about 10:30 A.M., and he expected to act as a signalman to direct the operations of the winchman in connection with the raising of pallets from the lower deck; as he moved toward the forward edge of the second tier of boards, two of them on which he was standing tilted forward causing him to fall upon either the lower deck or portions of the cargo which had not yet been removed; he suffered a fracture of the left humerus and possible low back derangement.

Obviously the libelant was not responsible for the tilting of the hatchboards, and the critical question in the case is why that happened. This directs attention to the hatch beams, because the libelant's theory—somewhat buttressed by the testimony—is that the offshore end of the beam supporting the forward end of these hatchboards moved forward two or three inches, thereby removing the support of the beam and causing the former to tilt forward, with the results to the libelant which have been stated.

This would seem to be a plausible explanation because if the beam moved forward, the boards would lose transverse

support at their forward end, and the libelant could have tripped over the beam in falling, even though it was but slightly out of place.

No one seems to question that this is what happened because the fact of the fall is clearly demonstrated, and the presence in the lower hold of two or three of the hatchboards in a slanting position was observed by the witness Jacobsen immediately after the libelant's fall.

It is therefore found that the hatch beam in question did move at its offshore end sufficiently to disengage the hatchboards which fell, and thereby the libelant was caused to be injured.

This directs attention to the hatch beams which were of the so-called roller type.

The purpose of using such beams is to admit of their being moved in a fore and aft direction without being manually lifted, and the nature of this form of construction is the subject of testimony and is somewhat shown in certain of the photographs introduced by libelant.

The beam was equipped with rollers at either end, mounted on tracks running fore and aft, which were affixed to the sides of the hatch coaming a few inches below its top.

The respondent's brief describes the construction as follows:

"* * * Below those tracks and running parallel with them on each side of the hatch coaming, there was a second beam or flange extending out a few inches from the side of the coaming. When the hatch beams were secured in position to support the hatchboards, the bottom part of the beam ends rested on the lower track between two flanges about one-half inch high which were welded to the lower track. Those flanges prevented the beams from moving forward or aft when the beams were resting on the lower track. (Record, p. 44, libelant's exhibit 2.)

"To move the beams out of position between the two flanges, it was necessary to raise the ends of the beams to a point higher than the securing flanges. This was accomplished by means of a lever inserted into a notch at the end of each beam. (Note: That lever is referred to in the testimony as a handle, and is a large heavy device about 3 feet long, made of steel, and bent in the middle.) A cam shaft connected the end of the beam to the roller and an upward movement of the lever would turn the cam shaft so as to raise the beam off the lower track and above the tops of the flanges. Once raised, the beam could be rolled backward and forward. (Record, p. 52.)"

The foregoing is thought to be substantially in accord with the deposition testimony of the witness Thomas O. Taggart, the material parts of which were read into the record; he was the chief officer of the then Mt. Whitney, and among other things described the type of hatch beam carried on the ship, namely, "the roller type beam."

When the beam was seated, he said "* * * it rested in between two welded nicks on the hatch coaming. They were about a half inch high which were to prevent the beam from moving forward or aft, and they were supposed to be in place and steady."

It is to be regretted that the precise position of these two welded elements is not clearly revealed in the evidence, but it sufficiently appears that if the beam were raised more than half an inch, their retaining office would be avoided, and the beam could move forward or aft; but whether this could be accomplished without actuating the roller does not appear.

The importance of this aspect of the construction becomes apparent when the effort is made to account for the movement of the beam which is testified to have been observed. That could have been brought about either by the actuation of the lever or handle as to which all testimony is negative, or by the striking of the beam by a pallet which was being hoisted from the lower hold.

The first possibility is rejected, not only because of the negative character of the testimony on the subject, but because no occasion is suggested for anyone to have sought to raise the beam for any purpose whatever. Since however it is said to have moved, the only remaining cause which the evidence suggests, is the striking of the beam as has been stated, by the upward movement of a pallet being hoisted from the lower hold.

In this connection it is interesting to note that Captain Taggart testified with regard to his observation concerning how beams were held in engagement at their ends, as follows:

"Most of them were secured by bolts running through the end of the beam and the hatch coaming."

And that as to this construction:

"Q. Aside from this particular function (of the handle), was there any other means which was used once the beam was down and not rolling, was there any other means used of securing the beam to hold it in place? A. Not that I recall.

"Q. Is it right to say then that beyond that it merely depended upon the weight of the beam resting on the coaming to hold it in place; is that right? A. That is correct, in addition to the two little flanks to keep it from moving fore and aft."

From the foregoing it is reasonable to infer that the raising of a loaded pallet which might strike a glancing blow at the lower edge of the beam would be sufficient to move the latter the space of the two or three inches previously referred to.

It is true that both the winchman McCoy and the witness Miller, who was working in the lower hold and saw the libelant immediately after he fell, denied that there was any striking by the pallet against the beam immediately before the accident; it is also true that hearsay statements, namely, a log entry and a statement made by a witness, were to the contrary purport, and the court is not supposed to base a finding merely upon hearsay testimony.

In spite of the foregoing, the only way that I can account for the movement of the beam is above explained, and while this falls short of a positive finding on the subject, the decision will proceed upon the theory that that is what took place.

The question is then presented of whether there is evidence that the said striking indicates negligence on the part of Jarka and its employees in the handling of this cargo. No authority has been cited for the proposition that the mere striking of such a pallet against such a beam, within the confines of this area of operation, can be so characterized. The mere fact that Moore had been instructed to act as a signalman for the guidance of the winchman in the conduct of the operation which was under way, is some evidence that care was taken to provide clearance of such a pallet while it was being hoisted, and the fact that he was unable to accomplish his mission cannot be deemed to be evidence that there was negligence on the part of the winchman in going forward with his task; apparently—although this is not too clear—the pallets were being loaded in the lower hold from piles of cargo which were in part in the wings of the hold, and the inference is supportable that not all pallets therefore started their upward movement in a truly vertical line; if this is so, a certain sway was inevitable as the hoisting proceeded, and it cannot be said that negligence is to be imported into the operation merely because there was a striking on the underside of this beam sufficiently heavy to cause it to move two or three inches at its outboard end. The testimony of Taggart is to the effect that such a happening was neither unusual nor extraordinary.

It is therefore found that the evidence does not establish negligence on the part of the Jarka Corporation in the raising of the pallet which is thought to have

struck the beam as the result of which the libelant was precipitated into the lower hold.

As to the nature and extent of the libelant's injuries, they have been sufficiently explained heretofore, except that some comment should be made on the asserted low back condition.

As to that, the libelant's witness, Dr. Wallace Green who is an orthopedic surgeon, examined libelant on January 5, 1955 and again on September 21, 1956. He described the disability in the left arm resulting from the fracture as a five-degree limitation in extension and a weakening in the function of the left elbow. He also said that there was apparent pain in the lumbar sacroiliac region. His diagnosis was "Fracture of the left humerus, healed with limitation of extension of the left elbow, and residual weakness in the muscles of the left upper extremity. Post concussion syndrome with headaches. Traumatic low back derangement."

On the occasion of the first examination, the patient was instructed to wear a well-fitted lumbosacral two-strap support and to take certain medication to relieve the headaches. There was no muscle spasm observable by the doctor, and on the occasion of the second examination there was no reference in the doctor's report to whether the patient was wearing the belt which had been prescribed, and as to that the libelant did not testify on the subject. His failure to do so would be consistent with a correction of the condition first above described, which coupled with the patient's ability to raise his legs to a horizontal position, as the doctor testified, would seem

to indicate that the back injury was of comparatively brief duration.

While the libelant said that he found that he was unable to resume his employment at the end of about six months to handle cargo in the sense of loading it, for instance, onto pallets, he was able to work as a signalman, and has done so ever since, at a rate of earning which is five cents an hour above that applicable to his former calling.

In the opinion presently held, while the ship was not unseaworthy because rigged with the roller type beams said to be common with vessels of the C-4 class, the libelant has demonstrated that the use of such beams was sufficiently attended with possible hazard to the longshoremen working under and around them, that their use at least in this case, constituted the hatch covering in lower 'tweendeck No. 2 an unsafe place to work, and it is therefore concluded that the libelant is entitled to a decree against the respondent shipowner. It is equally concluded that there was no negligence on the part of the Jarka Corporation in conducting the operation here involved so as to give rise upon its part of an obligation to indemnify the respondent, and consequently the impleading petition against Jarka is to be dismissed.

In making an award to the libelant, it is considered that his loss of earnings was for a period of six months, which computed according to the testimony, in round figures, would be $1,940, to which should be added $2,000 awarded for pain and suffering, and medical expenses as stipulated (against which a lien may have been filed) of $305.50, making in all $4,245.50.

Settle decree.